KREMER $v.$ CHEMICAL CONSTRUCTION CORP.

No. 80–6045.  Argued December 7, 1981—Decided May 17, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 486. STEVENS, J., filed a dissenting opinion, *post*, p. 508.

*David A. Barrett* argued the cause for petitioner. With him on the brief was *Frederick A. O. Schwarz, Jr.*

*Robert Layton* argued the cause and filed a brief for respondent.

*Deputy Solicitor General Wallace* argued the cause for the United States et al. as *amici curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Reynolds, Joshua I. Schwartz, Constance L. Dupre, Philip B. Sklover,* and *Sandra G. Bryan.**

JUSTICE WHITE delivered the opinion of the Court.

As one of its first acts, Congress directed that all United

---

**Robert E. Williams* and *Douglas S. McDowell* filed a brief for the Equal Employment Advisory Council as *amicus curiae* urging affirmance.

States courts afford the same full faith and credit to state court judgments that would apply in the State's own courts. Act of May 26, 1790, ch. 11, 1 Stat. 122, 28 U. S. C. § 1738. More recently, Congress implemented the national policy against employment discrimination by creating an array of substantive protections and remedies which generally allows federal courts to determine the merits of a discrimination claim. Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.* (1976 ed. and Supp. IV). The principal question presented by this case is whether Congress intended Title VII to supersede the principles of comity and repose embodied in § 1738. Specifically, we decide whether a federal court in a Title VII case should give preclusive effect to a decision of a state court upholding a state administrative agency's rejection of an employment discrimination claim as meritless when the state court's decision would be res judicata in the State's own courts.

## I

Petitioner Rubin Kremer emigrated from Poland in 1970 and was hired in 1973 by respondent Chemical Construction Corp. (Chemico) as an engineer. Two years later he was laid off, along with a number of other employees. Some of these employees were later rehired, but Kremer was not although he made several applications. In May 1976, Kremer filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC), asserting that his discharge and failure to be rehired were due to his national origin and Jewish faith. Because the EEOC may not consider a claim until a state agency having jurisdiction over employment discrimination complaints has had at least 60 days to resolve the matter, § 706(c), 42 U. S. C. § 2000e–5(c),[1] the Commission re-

---

[1] The statute provides that

"[i]n the case of an alleged unlawful employment practice occurring in a State . . . which has a State or local law prohibiting the unlawful employ-

ferred Kremer's charge to the New York State Division of Human Rights (NYHRD), the agency charged with enforcing the New York law prohibiting employment discrimination. N. Y. Exec. Law §§ 295(6), 296(1)(a) (McKinney 1972 and Supp. 1981–1982).

After investigating Kremer's complaint,[2] the NYHRD concluded that there was no probable cause to believe that Chemico had engaged in the discriminatory practices complained of. The NYHRD explicitly based its determination on the findings that Kremer was not rehired because one employee who was rehired had greater seniority, that another employee who was rehired filled a lesser position than that previously held by Kremer, and that neither Kremer's creed nor age was a factor considered in Chemico's failure to rehire him. The NYHRD's determination was upheld by its Appeal Board as "not arbitrary, capricious or an abuse of discretion." Kremer again brought his complaint to the attention of the EEOC and also filed, on December 6, 1977, a petition with the Appellate Division of the New York Supreme Court to set aside the adverse administrative determination. On February 27, 1978, five justices of the Appellate Division unanimously affirmed the Appeal Board's order. Kremer could have sought, but did not seek, review by the New York Court of Appeals.

---

ment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (b) of this section by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated." 42 U. S. C. § 2000e–5(c).

See also *Love* v. *Pullman Co.*, 404 U. S. 522 (1972); 29 CFR § 1601.13 (1981).

[2] Kremer's complaint filed with the NYHRD alleged discrimination on the basis of age and religion, and did not contain a separate claim concerning national origin.

Subsequently, a District Director of the EEOC ruled that there was no reasonable cause to believe that the charge of discrimination was true and issued a right-to-sue notice.[3] The District Director refused a request for reconsideration, noting that he had reviewed the case files and considered the EEOC's disposition as "appropriate and correct in all respects."

Kremer then brought this Title VII action in District Court, claiming discrimination on the basis of national origin and religion.[4] Chemico argued from the outset that Kremer's Title VII action was barred by the doctrine of res judicata. The District Court initially denied Chemico's motion to dismiss. 464 F. Supp. 468 (SDNY 1978). The court noted that the Court of Appeals for the Second Circuit had recently found such state determinations res judicata in an action under 42 U. S. C. § 1981, *Mitchell* v. *National Broadcasting Co.*, 553 F. 2d 265 (1977), but distinguished Title VII cases because of the statutory grant of *de novo* federal review. Several months later the Second Circuit extended the *Mitchell* rule to Title VII cases. *Sinicropi* v. *Nassau*

---

[3] Sections 706(f)(1) and (3), 42 U. S. C. §§ 2000e–5f(1) and (3), provide that where the EEOC determines that there is no reasonable cause to believe that a charge is true, it must dismiss the charge and issue the complainant a statutory right-to-sue letter. Where the Commission has not filed a civil action against the employer, it must, if requested, issue a right-to-sue letter 180 days after the charge was filed. Within 90 days after receipt of the right-to-sue letter, the complainant may institute a civil action in federal district court against the party named in the charge.

[4] No further mention was made of age discrimination, which is not covered by Title VII. Nor has petitioner argued at any point that his national origin claim was in any sense distinct from his claim of religious discrimination. Of course, if Kremer desired to make such a claim, he was obligated to first bring it before the NYHRD. See n. 1, *supra*. Moreover, "[a] party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding." *Underwriters National Assur. Co.* v. *North Carolina Life & Accident & Health Insurance Guaranty Assn.*, 455 U. S. 691, 710 (1982); *Sherrer* v. *Sherrer*, 334 U. S. 343, 352 (1948).

*County,* 601 F. 2d 60 *(per curiam),* cert. denied, 444 U. S. 983 (1979). The District Court then dismissed the complaint on grounds of res judicata. 477 F. Supp. 587 (SDNY 1979). The Court of Appeals refused to depart from the *Sinicropi* precedent and rejected petitioner's claim that *Sinicropi* should not be applied retroactively. 623 F. 2d 786 (1980).

A motion for rehearing en banc was denied, and petitioner filed for a writ of certiorari. We issued the writ, 452 U. S. 960 (1981), to resolve this important issue of federal employment discrimination law over which the Courts of Appeals are divided.[5] We now affirm.

## II

Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged.[6] Here the Appellate Division of the New York Supreme Court has issued a judgment affirming the decision of the NYHRD Appeals Board that the discharge and failure to rehire Kremer were not the product of the discrimination that he had alleged. There is no question

---

[5] Three Courts of Appeals have held that a federal court may not attribute preclusive deference to prior state court decisions reviewing state agency determinations. *Smouse* v. *General Electric Co.,* 626 F. 2d 333 (CA3 1980) *(per curiam); Unger* v. *Consolidated Foods Corp.,* 657 F. 2d 909 (CA7 1981); *Gunther* v. *Iowa State Men's Reformatory,* 612 F. 2d 1079 (CA8), cert. denied, 446 U. S. 966 (1980). The Fourth Circuit has held that issues decided in a *de novo* state judicial proceeding are not subject to redetermination in a subsequent Title VII action. *Moosavi* v. *Fairfax County Board of Education,* 666 F. 2d 58 (1981).

[6] In the Act of May 26, 1790, ch. 11, 1 Stat. 122, Congress required all federal courts to give such preclusive effect to state court judgments "as they have by law or usage in the courts of the state from [which they are] taken." In essentially unchanged form, the Act, now codified as 28 U. S. C. § 1738, provides that

"[t]he . . . judicial proceedings of any court of any such State . . . shall have the same full faith and credit in every court within the United States

that this judicial determination precludes Kremer from bringing "any other action, civil or criminal, based upon the same grievance" in the New York courts. N. Y. Exec. Law § 300 (McKinney 1972). By its terms, therefore, § 1738 would appear to preclude Kremer from relitigating the same question in federal court.

Kremer offers two principal reasons why § 1738 does not bar this action. First, he suggests that in Title VII cases Congress intended that federal courts be relieved of their usual obligation to grant finality to state court decisions. Second, he urges that the New York administrative and judicial proceedings in this case were so deficient that they are not entitled to preclusive effect in federal courts and, in any

---

and its Territories and Possessions as they have by law or usage in the courts of such State . . . ."

Accordingly the federal courts consistently have applied res judicata and collateral estoppel to causes of action and issues decided by state courts. *Allen* v. *McCurry,* 449 U. S. 90, 96 (1980); *Montana* v. *United States,* 440 U. S. 147 (1979); *Angel* v. *Bullington,* 330 U. S. 183 (1947). Indeed, from *Cromwell* v. *County of Sac,* 94 U. S. 351 (1877), to *Federated Department Stores, Inc.* v. *Moitie,* 452 U. S. 394 (1981), this Court has consistently emphasized the importance of the related doctrines of res judicata and collateral estoppel in fulfilling the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction. Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Allen* v. *McCurry, supra,* at 94; *Cromwell* v. *County of Sac, supra,* at 352. Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties. *Montana* v. *United States, supra,* at 153. *Parklane Hosiery Co.* v. *Shore,* 439 U. S. 322, 326, n. 5 (1979). Thus, invocation of res judicata and collateral estoppel "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen* v. *McCurry,* 449 U. S., at 94. When a state court has adjudicated a claim or issue, these doctrines also serve to "promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Id.,* at 96.

event, the rejection of a state employment discrimination claim cannot by definition bar a Title VII action. We consider this latter contention in Part III.

### A

*Allen* v. *McCurry*, 449 U. S. 90, 99 (1980), made clear that an exception to § 1738 will not be recognized unless a later statute contains an express or implied partial repeal. There is no claim here that Title VII expressly repealed § 1738; if there has been a partial repeal, it must be implied. "It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored," *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 154 (1976); *United States* v. *United Continental Tuna Corp.*, 425 U. S. 164, 168 (1976), and whenever possible, statutes should be read consistently. There are, however,

> "'two well-settled categories of repeals by implication— (1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest . . . .'" *Radzanower* v. *Touche Ross & Co.*, *supra*, at 154, quoting *Posadas* v. *National City Bank*, 296 U. S. 497, 503 (1936).

The relationship of Title VII to § 1738 does not fall within either of these categories. Congress enacted Title VII to assure equality of employment opportunities without distinction with respect to race, color, religion, sex, or national origin. *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 44 (1974); *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792, 800 (1973). To this end the EEOC was created and the federal courts were entrusted with ultimate enforcement responsibility. State antidiscrimination laws, however, play

an integral role in the congressional scheme. Whenever an incident of alleged employment discrimination occurs in a State or locality which by law prohibits such discrimination and which has established an "authority to grant or seek relief from such [discrimination] or to institute criminal proceedings with respect thereto," no charge of discrimination may be actively processed by the EEOC until the state remedy has been invoked and at least 60 days have passed, or the state proceedings have terminated. § 706(c), 42 U. S. C. § 2000e–5(c). Only after providing the appropriate state agency an opportunity to resolve the complaint may an aggrieved individual press his complaint before the EEOC. In its investigation to determine whether there is reasonable cause to believe that the charge of employment discrimination is true, the Commission is required to "accord substantial weight to final findings and orders made by State and local authorities in proceedings commenced under State or local law" pursuant to the limited deferral provisions of § 706, but is not bound by such findings. *Alexander* v. *Gardner-Denver Co., supra,* at 48, n. 8. If the EEOC finds reasonable cause to believe that discrimination has occurred, it undertakes conciliation efforts to eliminate the unlawful practice; if these efforts fail, the Commission may elect to bring a civil action to enforce the Act. If the Commission declines to do so, or if the Commission finds no reasonable cause to believe that a violation has occurred, "a civil action" may be brought by an aggrieved individual. § 706(f)(1), 42 U. S. C. § 2000e–5(f)(1).

No provision of Title VII requires claimants to pursue in state court an unfavorable state administrative action, nor does the Act specify the weight a federal court should afford a final judgment by a state court if such a remedy is sought. While we have interpreted the "civil action" authorized to follow consideration by federal and state administrative *agencies* to be a "trial *de novo,*" *Chandler* v. *Roudebush,* 425 U. S. 840, 844–845 (1976); *Alexander* v. *Gardner-Denver Co., supra,* at 38; *McDonnell Douglas Corp.* v. *Green, supra,* at

798–799, neither the statute nor our decisions indicate that the final judgment of a state *court* is subject to redetermination at such a trial. Similarly, the congressional directive that the EEOC should give "substantial weight" to findings made in state proceedings, § 706(b), 42 U. S. C. § 2000e–5(b), indicates only the minimum level of deference the EEOC must afford all state determinations; it does not bar affording the greater preclusive effect which may be required by § 1738 if judicial action is involved.[7] To suggest otherwise, to say that either the opportunity to bring a "civil action" or the "substantial weight" requirement implicitly repeals § 1738, is to prove far too much. For if that is so, even a full trial on the merits in state court would not bar a trial *de novo* in federal court and would not be entitled to more than "substantial weight" before the EEOC. The state courts would be placed on a one-way street; the finality of their decisions would depend on which side prevailed in a given case.[8]

Since an implied repeal must ordinarily be evident from the language or operation of a statute, the lack of such manifest incompatability between Title VII and § 1738 is enough to answer our inquiry. No different conclusion is suggested by the legislative history of Title VII. Although no inescapable

---

[7] EEOC review of discrimination charges previously rejected by state agencies would be pointless if the federal courts were bound by such agency decisions. *Batiste* v. *Furnco Constr. Corp.*, 503 F. 2d 447, 450, n. 1 (CA7 1974), cert. denied, 420 U. S. 928 (1975). Nor is it plausible to suggest that Congress intended federal courts to be bound further by state administrative decisions than by decisions of the EEOC. Since it is settled that decisions by the EEOC do not preclude a trial *de novo* in federal court, it is clear that unreviewed administrative determinations by state agencies also should not preclude such review even if such a decision were to be afforded preclusive effect in a State's own courts. *Garner* v. *Giarrusso*, 571 F. 2d 1330 (CA5 1978); *Batiste* v. *Furnco Constr. Corp., supra; Cooper* v. *Philip Morris, Inc.*, 464 F. 2d 9 (CA6 1972); *Voutsis* v. *Union Carbide Corp.*, 452 F. 2d 889 (CA2 1971), cert. denied, 406 U. S. 918 (1972).

[8] Section 706(b) guarantees that the outcome of both agency and judicial proceedings will be given substantial weight. JUSTICE BLACKMUN interprets that provision as a ceiling on the deference federal courts are obli-

conclusions can be drawn from the process of enactment,[9] the legislative debates surrounding the initial passage of Title VII in 1964 and the substantial amendment adopted in 1972 plainly do not demonstrate that Congress intended to over-

gated to give state court judgments. *Post*, at 489. The "substantial weight" requirement, however, was added to Title VII in 1972 not because the EEOC was giving state administrative decisions too much weight, but because it was affording them too little significance. See *infra*, at 474–475, and n. 16. Finding an implied repeal of § 1738 in an amendment directed exclusively at increasing the deference to be given state decisions would be contrary to normal principles of statutory interpretation, let alone the more difficult test of demonstrating an implied repeal.

It is even more implausible to find an implied repeal in the limited deferral to pending state and local proceedings, § 706(c), 42 U. S. C. § 2000e–5(c). First, that provision does not even address the issue of the proper weight to be afforded state decisions. Moreover, because the section requires complainants to wait no longer than 60 days before initating federal proceedings, it is doubtful that Congress even contemplated that the provision applied after a complaint had run the full course of state administrative and judicial consideration. See, *e. g.*, *Oscar Mayer & Co.* v. *Evans*, 441 U. S. 750, 755 (1979) (Section 706(c) "is intended to give state *agencies* a limited opportunity to resolve problems of employment discrimination") (emphasis added); *Love* v. *Pullman Co.*, 404 U. S., at 526 (The purpose of § 706(c) is "to give state *agencies* a prior opportunity to consider discrimination complaints") (emphasis added).

For the same reasons, the EEOC's authority to enter work-sharing agreements with state agencies is irrelevant. This provision, like the limited deferral and "substantial weight" requirements, is directed at increasing, not reducing, the authority of state agencies to resolve employment discrimination disputes. All of these provisions are directed toward administrative cooperation, and lend no evidence of congressional intent to compromise or circumscribe the validity of state *judicial* proceedings. Although JUSTICE BLACKMUN implies that work-sharing agreements constitute the one "narrow exception for possible exclusive state agency jurisdiction," *post*, at 496, left by Congress, neither the statute nor its background so indicates. Indeed, it is no "exception" at all; even though the EEOC declines to process a charge under a work-sharing agreement, the statute does not prevent the complainant from subsequently filing suit in federal court.

[9] Interpretation of Title VII is hampered by the fact that there are no authoritative legislative reports. The House Civil Rights bill went directly to the Senate floor without committee consideration in hopes that it

ride the historic respect that federal courts accord state court judgments.[10]

At the time Title VII was written, over half of the States had enacted some form of equal employment legislation.[11] Members of Congress agreed that the States should play an important role in enforcing Title VII, but also felt the federal system should defer only to adequate state laws.[12] Congress considered a number of possible ways of achieving these goals, ranging from limiting Title VII's jurisdiction to States without fair employment laws to having Congress

would be approved without change. This did not happen. The bill including Title VII, was amended 87 times during the 83-day debate in the Senate. Upon being returned to the House, the bill was not subjected to the usual conference procedure. Instead, the House voted acceptance of the Senate measure. See EEOC, Legislative History of Titles VII and XI of the Civil Rights Act of 1964, pp. 9–11 (1968) (hereafter 1964 Leg. Hist.).

[10] JUSTICE BLACKMUN reads the legislative history differently, *post*, at 494–499, seizing upon doubts expressed concerning the adequacy of state remedies. It does not follow, however, that an implied repeal of § 1738 has been demonstrated. For that, the intent of Congress "must be clear and manifest." *Radzanower* v. *Touche Ross & Co.*, 426 U. S. 148, 154 (1976). JUSTICE BLACKMUN never claims that this rigorous standard is satisfied. Nor would such a claim be persuasive. Similar expressions of congressional concern with state remedies were unsuccessfully mustered in *Allen* v. *McCurry*, 449 U. S. 90 (1980), where we refused to find an implied repeal of § 1738 in the passage of 42 U. S. C. § 1983. See *infra*, at 476. JUSTICE BLACKMUN also claims too much from the refusal of Congress to place employment discrimination within the exclusive jurisdiction of the States, 22 of whom lacked any fair employment laws at the time Title VII was enacted. Reluctance to rely entirely on the States does not require a departure from traditional rules of res judicata when a state fair employment law exists, a state agency has investigated and processed a grievance, and a state court has upheld the agency's decision as procedurally fair and substantively justified.

[11] See Bureau of National Affairs, State Fair Employment Laws and Their Administration (1964). See also 110 Cong. Rec. 7205 (1964) (remarks of Sen. Clark).

[12] In their interpretive memorandum, Senators Clark and Case, floor managers of the bill, stated that

"Title VII specifically provides for the continued effectiveness of state and local laws and procedures for dealing with discrimination in employment"

or the President assess the adequacy of state laws. As Title VII emerged from the House, it empowered the EEOC to assess the adequacy of state laws and procedures. § 708(b), H. R. 7152, 88th Cong., 2d Sess. (1964). The Senate bill that was finally signed into law widened the state role by guaranteeing all States with fair employment practices laws an initial opportunity to resolve charges of discrimination. 42 U. S. C. § 2000e–5(c). Senator Humphrey, an advocate of strong enforcement, emphasized the state role under the legislation:

> "We recognized that many States already have functioning antidiscrimination programs to insure equal access to places of public accommodation and equal employment opportunity. We sought merely to guarantee that these States—and other States which may establish such programs—will be given every opportunity to employ their expertise and experience without premature interference by the Federal Government." 110 Cong. Rec. 12725 (1964).

Indeed, New York's fair employment laws were referred to in the congressional debates by proponents of the legislation as an example of existing state legislation effectively combating employment discrimination.[13]

Nothing in the legislative history of the 1964 Act suggests that Congress considered it necessary or desirable to provide an absolute right to relitigate in federal court an issue resolved by a state court. While striving to craft an optimal

---

and that "it will not override any state law or municipal ordinance which is not inconsistent." *Id.*, at 7214, 7216.

See also *id.*, at 7205 (remarks of Sen. Clark); *id.*, at 12725 (remarks of Sen. Humphrey). See generally Jackson, Matheson, & Piskorski, The Proper Role of Res Judicata and Collateral Estoppel in Title VII Suits, 79 Mich. L. Rev. 1485, 1493–1497 (1981) (hereinafter Jackson, Matheson, & Piskorski).

[13] 110 Cong. Rec. 1635–1636 (1964), reprinted in 1964 Leg. Hist. 3345–3346 (remarks of Cong. Reid) ("The New York State Commission for Human Rights has pioneered effectively and it has now been copied in 22 States . . ."); 110 Cong. Rec. 1643 (1964), 1964 Leg. Hist. 3258–3259

niche for the States in the overall enforcement scheme, the legislators did not envision full litigation of a single claim in both state and federal forums.[14]   Indeed, the requirement of a trial *de novo* in federal district court following EEOC proceedings was added primarily to protect employers from overzealous enforcement by the EEOC.   A memorandum signed by seven Representatives accompanying the compromise measure ultimately adopted, concluded that "we believe the employer or labor union will have a fairer forum to establish innocence since a trial de novo is required in district court proceedings."   H. R. Rep. No. 914, 88th Cong., 1st Sess., pt. 2, p. 29 (1963).   Similar views were expressed in 1972 when Congress reconsidered whether to give the EEOC adjudicatory and enforcement powers.[15]   There is also reason to believe that Congress required that the EEOC give state findings "substantial weight" because the Commission had

---

(remarks of Cong. Ryan); 110 Cong. Rec. 12595 (1964), 1964 Leg. Hist. 3066 (remarks of Sen. Clark).

[14] Senator Dirksen, the principal drafter of the Senate bill, stated in no uncertain terms his desire to avoid multiple suits arising out of the same discrimination:

"What a layering upon layer of enforcement.   What if the court orders differed in their terms or requirements?   There would be no assurance that they would be identical.   Should we have the Federal forces of justice pull on the one arm, and the State forces of justice tug on the other? Should we draw and quarter the victim?"   110 Cong. Rec. 6449 (1964).

[15] See, *e. g.*, 117 Cong. Rec. 42026 (1971), reprinted in Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, Legislative History of the Equal Employment Opportunity Act of 1972, p. 571 (1972) (hereafter 1972 Leg. Hist.) (remarks of Sen. Allen); 118 Cong. Rec. 932 (1972), 1972 Leg. Hist. 807 (same); 118 Cong. Rec. 311, 933 (1972), 1972 Leg. Hist. 632, 809 (remarks of Sen. Ervin); 118 Cong. Rec. 595 (1972), 1972 Leg. Hist. 682 (remarks of Sen. Tower); 118 Cong. Rec. 699–703 (1972), 1972 Leg. Hist. 698–709 (remarks of Sen. Fannin).

Opponents successfully objected to combining investigatory, adjudicatory, and enforcement power in a single agency.   A compromise, sponsored by Senator Dominick, was adopted which gave the EEOC the power to bring suit but retained a trial *de novo* in federal district court so that employers and other defendants would receive "an impartial judicial deci-

too freely ignored the determinations handed down by state agencies.[16]

An important indication that Congress did not intend Title VII to repeal § 1738's requirement that federal courts give full faith and credit to state court judgments is found in an exchange between Senator Javits, a manager of the 1972 bill, and Senator Hruska. Senator Hruska, concerned with the potential for multiple independent proceedings on a single discrimination charge, had introduced an amendment which would have eliminated many of the duplicative remedies for employment discrimination. Senator Javits argued that the amendment was unnecessary because the doctrine of res judicata would prevent repetitive litigation against a single defendant:

> "[T]here is the real capability in this situation of dealing with the question on the basis of res judicata. In other words once there is a litigation—a litigation started by the Commission, a litigation started by the Attorney General, or a litigation started by the individual—the remedy has been chosen and can be followed through and no relitigation of the same issues in a different forum would be permitted." 118 Cong. Rec. 3370 (1972).[17]

---

sion free from accusation of institutional bias." S. Rep. No. 92–415, p. 86 (1971), 1972 Leg. Hist. 464 (views of Sen. Dominick).

[16] Prior to the 1972 amendments, the EEOC was free to ignore state administrative decisions. In the Senate debates, Senator Montoya asked Senator Williams, the floor manager of the amendments, and Senator Ervin, an opponent, to explain the purpose of the "substantial weight" directive. Senator Ervin responded that the provision's purpose was to prevent the EEOC from reversing state decisions "peremptorily." The Commission would be required to "give due respect to the findings of the State or local authorities." 118 Cong. Rec. 310 (1972), 1972 Leg. Hist. 627. Senator Williams did not dispute this answer. See also Jackson, Matheson, & Piskorski, *supra* n. 12, at 1504–1505.

[17] We reject petitioner's suggestion, repeated by JUSTICE BLACKMUN, *post*, at 499–501, that since the Hruska amendment excluded state pro-

Senator Williams, another proponent of the 1972 bill, echoed Senator Javits' remarks: "I do not believe that the individual claimant should be allowed to litigate his claim to completion in one forum, and then if dissatisfied, go to another forum to try again." *Id.*, at 3372. After Senator Javits and Senator Williams spoke, an evenly divided Senate refused to approve the Hruska amendment.

It is sufficiently clear that Congress, both in 1964 and 1972, though wary of assuming the adequacy of state employment discrimination remedies, did not intend to supplant such laws. We conclude that neither the statutory language nor the congressional debates suffice to repeal § 1738's longstanding directive to federal courts.

### B

Our finding that Title VII did not create an exception to § 1738 is strongly suggested if not compelled by our recent decision in *Allen* v. *McCurry* that preclusion rules apply in 42 U. S. C. § 1983 actions and may bar federal courts from freshly deciding constitutional claims previously litigated in state courts. Indeed, there is more in § 1983 to suggest an implied repeal of § 1738 than we have found in Title VII. In *Allen*, we noted that "one strong motive" behind the enactment of § 1983 was the "grave congressional concern that the state courts had been deficient in protecting federal rights." 449 U. S., at 98–99. Nevertheless, we concluded that "much clearer support than this would be required to hold that § 1738 and the traditional rules of preclusion are not applicable to § 1983 suits." *Id.*, at 99.

---

ceedings, Senator Javits' comments "should in context also be read as excluding state proceedings from any application of res judicata in Title VII suits." Reply Brief for Petitioner 9, n. **. Not only is the idea that even a full state judicial proceeding be excluded from res judicata effect implausible on its face, but Senator Javits prefaced his res judicata statement by discussing the very New York employment discrimination laws under which Kremer proceeded. 118 Cong. Rec. 3370 (1972).

Because Congress must "clearly manifest" its intent to depart from § 1738, our prior decisions construing Title VII in situations where § 1738 is inapplicable are not dispositive. They establish only that *initial resort* to state administrative remedies does not deprive an individual of a right to a federal trial *de novo* on a Title VII claim. In *McDonnell Douglas Corp.* v. *Green*, 411 U. S. 792 (1973), and *Chandler* v. *Roudebush*, 425 U. S. 840 (1976), we held that the "civil action" in federal court following an EEOC decision was intended to be a trial *de novo*. This holding, clearly supported by the legislative history, is not a holding that a prior state court judgment can be disregarded.

The petitioner and the Courts of Appeals which have denied res judicata effect to such judgments rely heavily on our statement in *Alexander* v. *Gardner-Denver* that "final responsibility for enforcement of Title VII is vested with federal courts." 415 U. S., at 44.[18] We did not say, and our language should not be read to imply, that by vesting "final responsibility" in one forum, Congress intended to deny finality to decisions in another. The context of the statement makes this clear. In describing the operation of Title VII, we noted that the EEOC cannot adjudicate claims or impose sanctions; that responsibility, the "final responsibility for enforcement," must rest in federal court.

The holding in *Gardner-Denver* was that a private arbitration decision concerning an employment discrimination claim did not bind the federal courts. Arbitration decisions, of course, are not subject to the mandate of § 1738. Furthermore, unlike arbitration hearings under collective-bargaining agreements, state fair employment practice laws are explicitly made part of the Title VII enforcement scheme. Our decision in *Gardner-Denver* explicitly recognized the "distinctly separate nature of these contractual and statutory rights."

---

[18] See, *e. g.*, *Smouse* v. *General Electric Co.*, 626 F. 2d, at 334–335; *Gunther* v. *Iowa State Men's Reformatory*, 612 F. 2d, at 1082–1083.

*Id.*, at 50. Here we are dealing with a state statutory right, subject to state enforcement in a manner expressly provided for by the federal Act.

*Gardner-Denver* also rested on the inappropriateness of arbitration as a forum for the resolution of Title VII issues. The arbitrator's task, we recognized, is to "effectuate the intent of the parties rather than the requirements of enacted legislation." *Id.*, at 56–57. The arbitrator's specialized competence is "the law of the shop, not the law of the land," and "the factfinding process in arbitration usually is not equivalent to judicial factfinding." *Ibid.* These characteristics cannot be attributed to state administrative boards and state courts. State authorities are charged with enforcing laws, and state courts are presumed competent to interpret those laws.

Finally, the comity and federalism interests embodied in § 1738 are not compromised by the application of res judicata and collateral estoppel in Title VII cases. Petitioner maintains that the decision of the Court of Appeals will deter claimants from seeking state court review of their claims ultimately leading to a deterioration in the quality of the state administrative process. On the contrary, stripping state court judgments of finality would be far more destructive to the quality of adjudication by lessening the incentive for full participation by the parties and for searching review by state officials. Depriving state judgments of finality not only would violate basic tenets of comity and federalism, *Board of Regents* v. *Tomanio*, 446 U. S. 478, 488, 491–492 (1980), but also would reduce the incentive for States to work towards effective and meaningful antidiscrimination systems.[19]

---

[19] Here JUSTICE BLACKMUN's dissent rests on two dubious premises: that plaintiffs will be deterred from seeking state judicial review of administrative decisions and that the more such cases are subject to judicial review the better the system becomes. Obvious incentives remain for an individual with a truly meritorious claim to proceed. In New York, judi-

## III

The petitioner nevertheless contends that the judgment should not bar his Title VII action because the New York courts did not resolve the issue that the District Court must hear under Title VII—whether Kremer had suffered discriminatory treatment—and because the procedures provided were inadequate. Neither contention is persuasive. Although the claims presented to the NYHRD and subsequently reviewed by the Appellate Division were necessarily based on New York law, the alleged discriminatory acts are prohibited by both federal and state laws.[20] The elements of a successful employment discrimination claim are virtually identical; petitioner could not succeed on a Title VII claim

cial review of "no probable cause" determinations is rigorous in both a procedural and substantive sense, see *infra*, at 479–485, and n. 21. Forgoing such review ensures considerable delay and lengthening of the adjudicatory process. And the reward for such forbearance is a federal proceeding in which the existing adverse state decision must be given "substantial weight." JUSTICE BLACKMUN assumes, without supporting evidence, that this "strategy" is wise and very likely to be pursued in many cases. Even were this assumption plausible, it hardly follows that state proceedings are improved by the sheer quantity of administrative adjudications brought before them.

[20] The New York law is at least as broad as Title VII. Title 42 U. S. C. § 2000e–2(a) provides:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ."

New York Exec. Law § 296(1) (McKinney Supp. 1981–1982) provides:

"It shall be an unlawful discriminatory practice:

"(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual."

We, of course, do not decide in this case whether jurisdiction to entertain Title VII claims is limited to the federal courts.

consistently with the judgment of the NYHRD that there is no reason to believe he was terminated or not rehired because of age or religion. The Appellate Division's affirmance of the NYHRD's dismissal necessarily decided that petitioner's claim under New York law was meritless, and thus it also decided that a Title VII claim arising from the same events would be equally meritless.[21]

The more serious contention is that even though administrative proceedings and judicial review are legally sufficient to be given preclusive effect in New York, they should be deemed so fundamentally flawed as to be denied recognition under § 1738. We have previously recognized that the judicially created doctrine of collateral estoppel does not apply when the party against whom the earlier decision is asserted did not have a "full and fair opportunity" to litigate the claim

---

[21] JUSTICE BLACKMUN and JUSTICE STEVENS wrongly assert that the New York court's holding does not constitute a finding "one way or the other" on the merits of petitioner's claim. *Post*, at 492 (BLACKMUN, J., dissenting); *post*, at 509 (STEVENS, J., dissenting). When the NYHRD summarily dismisses a complaint, the Appellate Division must find that the petitioner's "complaint lacks merit as a matter of law." *Flah's, Inc.* v. *Schneider*, 71 App. Div. 2d 993, 420 N. Y. S. 2d 283, 284 (1979). See also *New York State Div. for Youth* v. *State Human Rights Appeal Board*, 83 App. Div. 2d 972, 973, 442 N. Y. S. 2d 813, 814 (1981) ("Since the investigation as conducted by the division involved separate meetings without hearings, it must appear in such instance that, as a matter of law, the complaint lacks merit in order for the division to dismiss the complaint"); *State Div. of Human Rights* v. *Blanchette*, 73 App. Div. 2d 820, 821, 423 N. Y. S. 2d 745, 746 (1979) ("[T]he division may not determine that there is no probable cause for the complaint and dismiss it when the facts revealed in the investigation do not 'generate conviction in and persuade a fair and detached fact finder' that that there is no substance in the complaint"); *Stasiak* v. *Montgomery Ward & Co.*, 66 App. Div. 2d 962, 411 N. Y. S. 2d 700, 701 (1978) ("In order to sustain a dismissal of a complaint before the complainant has had his opportunity to present his case in a formal manner, it must appear virtually as a matter of law that the complaint lacks merit"); *Altiery* v. *State Div. of Human Rights*, 61 App. Div. 2d 780, 781, 402 N. Y. S. 2d 405, 406 (1978) ("It cannot be said as a matter of law, that the complaint . . .

or issue, *Allen* v. *McCurry,* 449 U. S., at 95; *Montana* v. *United States,* 440 U. S. 147, 153 (1979); *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 328–329 (1971).[22] "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana* v. *United States, supra,* at 164, n. 11. Cf. *Gibson* v. *Berryhill,* 411 U. S. 564 (1973).

Our previous decisions have not specified the source or defined the content of the requirement that the first adjudication offer a full and fair opportunity to litigate. But for present purposes, where we are bound by the statutory directive of § 1738, state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law. It has long been established that § 1738 does not allow federal courts to employ their own rules of res judicata in determining the ef-

---

lacked merit"). Decisions applying the standard employed in the foregoing cases are decisions on the merits, just as was the decision in *State Div. of Human Rights* v. *New York State Drug Abuse Comm'n,* 59 App. Div. 2d 332, 336, 399 N. Y. S. 2d 541, 544 (1977) (when a complainant has a "full opportunity to present his evidence and exhibits, under oath if he so requests," the presence of a "rational basis in the record" for that decision will suffice). It is well established that judicial affirmance of an administrative determination is entitled to preclusive effect. *CIBA Corp.* v. *Weinberger,* 412 U. S. 640, 644 (1973); *Grubb* v. *Public Utilities Comm'n,* 281 U. S. 470, 475–477 (1930). There is no requirement that judicial review must proceed *de novo* if it is to be preclusive. Furthermore, as we have explained, Congress did not draft the *de novo* requirement in order to deny preclusive effect to state decisions. See *supra,* at 474.

[22] While our previous expressions of the requirement of a full and fair opportunity to litigate have been in the context of collateral estoppel or issue preclusion, it is clear from what follows that invocation of res judicata or claim preclusion is subject to the same limitation.

The lower courts did not discuss whether it is the doctrine of res judicata or collateral estoppel that applies here. Section 1738 requires dismissal of

fect of state judgments. Rather, it goes beyond the common law and commands a federal court to accept the rules chosen by the State from which the judgment is taken. *McElmoyle* v. *Cohen*, 13 Pet. 312, 326 (1839); *Mills* v. *Duryee*, 7 Cranch 481, 485 (1813). As we recently noted in *Allen* v. *McCurry*, *supra*, "though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." 449 U. S., at 96.

The State must, however, satisfy the applicable requirements of the Due Process Clause. A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment,[23] and other state and federal courts are not required to accord full faith and credit to such a judgment. Section 1738 does not suggest otherwise; other state and federal courts would still be providing a state court judgment with the "same" preclusive effect as the courts of the State from which the judgment emerged. In such a case, there

---

petitioner's Title VII suit whether his Title VII claim is precluded by the New York judgment or whether he is collaterally estopped by that judgment from complaining that Chemico had discriminated against him. Res judicata has recently been taken to bar claims arising from the same transaction even if brought under different statutes, *Nash County Bd. of Ed.* v. *Biltmore Co.*, 640 F. 2d 484, 488 (CA4), cert. denied, 454 U. S. 878 (1981). See also Restatement (Second) of Judgments § 61(1) (Tent. Draft No. 5, Mar. 10, 1978); Currie, Res Judicata: The Neglected Defense, 45 U. Chi. L. Rev. 317, 340–341 (1978). It may be that petitioner would be precluded under res judicata from pursuing a Title VII claim. However that may be, it is undebatable that petitioner is at least estopped from relitigating the issue of employment discrimination arising from the same events.

[23] Cf. *McDonald* v. *Mabee*, 243 U. S. 90, 92 (1917) ("[A]n ordinary personal judgment for money, invalid for want of service amounting to due process of law, is as ineffective in the State as it is outside of it"); *Haddock* v. *Haddock*, 201 U. S. 562, 567, 568 (1906).

could be no constitutionally recognizable preclusion at all.[24]

We have little doubt that Kremer received all the process that was constitutionally required in rejecting his claim that he had been discriminatorily discharged contrary to the statute. We must bear in mind that no single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause. *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600, 610 (1974); *Inland Empire Council* v. *Millis*, 325 U. S. 697, 710 (1945). "'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Mitchell* v. *W. T. Grant Co.*, *supra*, at 610 (quoting *Cafeteria Workers* v. *McElroy*, 367 U. S. 886, 895 (1961)). Under New York law, a claim of employment discrimination requires the NYHRD to investigate whether there is "probable cause" to believe that the complaint is true. Before this determination of probable cause is made, the claimant is entitled to a "full opportunity to present on the record, though informally, his charges against his employer or other respondent, including the right to submit all exhibits which he wishes to present and testimony of witnesses in addition to his own testimony." *State Div. of Human Rights* v. *New York State Drug Abuse Comm'n*, 59 App. Div. 2d 332, 336, 399 N. Y. S. 2d 541, 544 (1977). The complainant also is entitled to an opportunity "to rebut evidence submitted by or obtained from the respondent." 9 N. Y. C. R. R. § 465.6 (1977). He may have an attorney assist him and may ask the division to issue subpoenas. 9 N. Y. C. R. R. § 465.12(c) (1977).

If the investigation discloses probable cause and efforts at conciliation fail, the NYHRD must conduct a public hearing

---

[24] The Court's decisions enforcing the Full Faith and Credit Clause of the Constitution, Art. IV, § 1, also suggest that what a full and fair opportunity to litigate entails is the procedural requirements of due process. *Sherrer* v. *Sherrer*, 334 U. S., at 348 ("there is nothing in the concept of due process which demands that a defendant be afforded a second opportu-

to determine the merits of the complaint. N. Y. Exec. Law § 297(4)(a) (McKinney Supp. 1981–1982). A public hearing must also be held if the Human Rights Appeal Board finds "there has not been a full investigation and opportunity for the complainant to present his contentions and evidence, with a full record." *State Div. of Human Rights* v. *New York State Drug Abuse Comm'n, supra,* at 337, 399 N. Y. S. 2d, at 544–545.[25] Finally, judicial review in the Appellate Division is available to assure that a claimant is not denied any of the procedural rights to which he was entitled and that the NYHRD's determination was not arbitrary and capricious. N. Y. Civ. Prac. Law § 7803 (McKinney 1981). See *Gregory* v. *New York State Human Rights Appeal Board,* 64 App. Div. 2d 775, 776, 407 N. Y. S. 2d 256, 257 (1978); *Tenenbaum* v. *State Div. of Human Rights,* 50 App. Div. 2d 257, 259, 376 N. Y. S. 2d 542, 544 (1975).

We have no hesitation in concluding that this panoply of procedures, complemented by administrative as well as judicial review, is sufficient under the Due Process Clause.[26]

---

nity to litigate the existence of jurisdictional facts"); *Baldwin* v. *Iowa Traveling Men's Assn.,* 283 U. S. 522, 524 (1931); *Chicago Life Insurance Co.* v. *Cherry,* 244 U. S. 25, 30 (1917). Section 1738 was enacted to implement the Full Faith and Credit Clause, *Magnolia Petroleum Co.* v. *Hunt,* 320 U. S. 430, 437 (1943), and specifically to insure that federal courts, not included within the constitutional provision, would be bound by state judgments. *Davis* v. *Davis,* 305 U. S. 32, 40 (1938) ("The Act extended the rule of the Constitution to all courts, federal as well as state"). See also *Underwriters National Assur. Co.* v. *North Carolina Life & Accident & Health Insurance Guaranty Assn.,* 455 U. S. 691 (1982). It is therefore reasonable that § 1738 be subject to no more restriction than the Full Faith and Credit Clause.

[25] The Human Rights Appeal Board is authorized to reverse or remand any order that is not "supported by substantial evidence on the whole record" or that is "arbitrary, capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." N. Y. Exec. Law §§ 297–a(7)(d) and (e) (McKinney 1972).

[26] Certainly, the administrative nature of the factfinding process is not dispositive. In *United States* v. *Utah Construction & Mining Co.,* 384

Only where the evidence submitted by the claimant fails, as a matter of law, to reveal any merit to the complaint may the NYHRD make a determination of no probable cause without holding a hearing. *Flah's, Inc.* v. *Schneider*, 71 App. Div. 2d 993, 420 N. Y. S. 2d 283, 284 (1979). See n. 21, *supra.* And before that determination may be reached, New York requires the NYHRD to make a full investigation, wherein the complainant has full opportunity to present his evidence, under oath if he so requests. *State Div. of Human Rights* v. *New York State Drug Abuse Control Comm'n, supra,* at 336, 399 N. Y. S. 2d, at 544. The fact that Mr. Kremer failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy. Cf. *Juidice* v. *Vail,* 430 U. S. 327, 337 (1977).

### IV

In our system of jurisprudence the usual rule is that merits of a legal claim once decided in a court of competent jurisdiction are not subject to redetermination in another forum. Such a fundamental departure from traditional rules of preclusion, enacted into federal law, can be justified only if plainly stated by Congress.[27] Because there is no "affirmative showing" of a "clear and manifest" legislative purpose in Title VII to deny res judicata or collateral estoppel effect to a state court judgment affirming that a claim of employment discrimination is unproved, and because the procedures provided in New York for the determination of such claims offer a full and fair opportunity to litigate the merits, the judgment of the Court of Appeals is

*Affirmed.*

---

U. S. 394 (1966), we held that, so long as opposing parties had an adequate opportunity to litigate disputed issues of fact, res judicata is properly applied to decisions of an administrative agency acting in a "judicial capacity." *Id.,* at 422.

[27] One example is the authorization for federal courts to reexamine state findings upon a request for a writ of habeas corpus. 28 U. S. C. § 2254.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

Today the Court follows an isolated Second Circuit approach and holds that a discrimination complainant cannot bring a Title VII suit in federal court after unsuccessfully seeking state court "review" of a state antidiscrimination agency's unfavorable decision. The Court embraces a rule that has been subject to challenge within the Second Circuit[1] and that has been "vigorously attacked and soundly rejected by other courts."[2] The Court reaches this result because it purports to find nothing in Title VII inconsistent with the application of the general preclusion rule of 28 U. S. C. § 1738 to the state court's affirmance of the state agency's decision. For a compelling array of reasons, the Court is wrong.

---

[1] Before the Court of Appeals addressed the issue, one District Court in the Second Circuit held that a state court affirmance of a decision by the New York State Division of Human Rights did not preclude a subsequent Title VII suit. *Benneci* v. *Department of Labor, New York State Division of Employment*, 388 F. Supp. 1080 (SDNY 1975). Then in *Mitchell* v. *National Broadcasting Co.*, 553 F. 2d 265 (1977), the Second Circuit ruled, over a strong dissent, that a state court affirmance of a state agency decision barred a subsequent civil rights suit under 42 U. S. C. § 1981. Later, in a brief *per curiam* decision, *Sinicropi* v. *Nassau County*, 601 F. 2d 60, cert. denied, 444 U. S. 983 (1979), the Circuit concluded that *Mitchell* dictated the same res judicata result for Title VII, despite the significant differences between § 1981 and the complex structure of Title VII, which expressly addresses the role of state proceedings in the resolution of discrimination claims. The District Judge in this case appropriately felt himself bound by *Sinicropi*, but he wrote a persuasive opinion questioning its wisdom. 477 F. Supp. 587, 591–594 (SDNY 1979). On appeal, a panel of the Second Circuit also found the outcome in this case dictated by *Sinicropi*. 623 F. 2d 786 (1980). Two judges of that court voted for rehearing en banc. App. 80.

[2] *Unger* v. *Consolidated Foods Corp.*, 657 F. 2d 909, 914, n. 5 (CA7 1981). All other Courts of Appeals that have considered the issue have disagreed with the Second Circuit. In addition to *Unger*, see *Smouse* v. *General Electric Co.*, 626 F. 2d 333, 336 (CA3 1980) (expressly rejecting

## I

The Court, as it must, concedes that a state *agency* determination does not preclude a trial *de novo* in federal district court. *Ante*, at 468–470, and n. 7. Congress made it clear beyond doubt that state agency findings would not prevent the Title VII complainant from filing suit in federal court.

Title VII provides that no charge may be filed until 60 days "after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated." § 706(c), 42 U. S. C. § 2000e–5(c). After a charge is filed, the Equal Employment Opportunity Commission (EEOC) may take action and, eventually, the complainant may file suit, §§ 706(b) and (f)(1). By permitting a charge to be filed after termination of state proceedings, the statute expressly contemplates that a plaintiff may bring suit despite a state finding of no discrimination.[3]

_____

*Sinicropi*); *Gunther* v. *Iowa State Men's Reformatory*, 612 F. 2d 1079, 1084 (CA8) ("questioning" *Sinicropi*), cert. denied, 446 U. S. 966 (1980). See also *Aleem* v. *General Felt Industries, Inc.*, 661 F. 2d 135, 137 (CA9 1981) ("*Sinicropi* is inconsistent with the Supreme Court's decision in *Alexander* [v. *Gardner-Denver Co.*, 415 U. S. 36 (1974)]").

Commentators, too, agree that the Second Circuit's rule is ill-conceived. See Note, Res Judicata in Successive Employment Discrimination Suits, 1980 U. Ill. Law Forum 1049, 1099; Comment, 15 Harv. Civ. Rights-Civ. Lib. L. Rev. 29, 266–276 (1980) (criticizing application of Second Circuit's rule to 42 U. S. C. § 1981); Comment, 31 Rutgers L. Rev. 973 (1979) (same); Comment, 6 Ford. Urban L. J. 481, 492–494 (1978) (same); Comment, 62 Minn. L. Rev. 987 (1978); Note, 53 N. Y. U. L. Rev. 187 (1978). See also Jackson, Matheson, & Piskorski, The Proper Role of Res Judicata and Collateral Estoppel in Title VII Suits, 79 Mich. L. Rev. 1485, 1519–1520 (1981) (rejecting application of res judicata when, as in this case, the state court affirms a state agency finding of no probable cause); Comment, 30 Vand. L. Rev. 1260 (1977); Richards, Alexander v. Gardner-Denver: A Threat to Title VII Rights, 29 Ark. L. Rev. 129, 158 (1975) (interpreting Title VII contrary to Second Circuit's decisions, but before the relevant Second Circuit cases were decided).

[3] See also § 706(f)(1) (permitting the district court to stay a Title VII suit for not more than 60 days pending termination of "State or local pro-

This fact is also made clear by § 706(b). In 1972, by Pub. L. 92–261, § 4, 86 Stat. 104, Congress amended that section by directing that the EEOC "accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law."[4] If the original version of Title VII had given the outcomes of state "proceedings" preclusive effect, Congress would not have found it necessary to amend the statute in 1972 to direct that they be given "substantial weight." And if in 1972 Congress had intended final decisions in state "proceedings" to have preclusive effect, it certainly would not have instructed that they be given "substantial weight."[5]

Thus, Congress expressly recognized in both § 706(b) and § 706(c) that a complainant could bring a Title VII suit in federal court despite the conclusion of state "proceedings." And, as the Court must acknowledge, see *ante*, at 470–471, n. 8, when Congress referred to state "proceedings," it referred to both state agency proceedings and state judicial

---

ceedings," without suggesting that the termination would bar further district court proceedings).

[4] By indicating that final decisions in state proceedings have no preclusive effect on the EEOC, Congress also indicated that final decisions in state proceedings do not preclude a subsequent Title VII suit in federal court. "It would be meaningless for Congress to set up standards for E. E. O. C. examination of cases after determinations were made in state proceedings if Congress intended that those cases be barred from consideration in federal court," because the EEOC, "which lacks enforcement power, would be attempting to mediate with defendants who were already protected from any further legal action." *Batiste* v. *Furnco Constr. Corp.*, 503 F. 2d 447, 450, n. 1 (CA7 1974), cert. denied, 420 U. S. 928 (1975).

[5] Congress simply would have inserted the words "preclusive effect" instead of "substantial weight." The legislative history of the "substantial weight" amendment indicates that Congress intended for the EEOC to refrain only from overturning state decisions "peremptorily" and for the EEOC simply to give them "due respect." 118 Cong. Rec. 310 (1972) (remarks of Sen. Ervin).

review of those agency proceedings. "[T]hroughout Title VII the word 'proceeding,' or its plural form, is used to refer to all the different types of proceedings in which the statute is enforced, state and federal, administrative and judicial." *New York Gaslight Club, Inc.* v. *Carey*, 447 U. S. 54, 62–63 (1980).

Yet the Court nevertheless finds that petitioner's Title VII suit is precluded by the termination of state "proceedings." In this case, the New York State Division of Human Rights (NYHRD) found no probable cause to believe that petitioner had been a victim of discrimination. Under the Court's own rule, that determination in itself does not bar petitioner from filing a Title VII suit in federal district court. According to the Court, however, petitioner lost his opportunity to bring a federal suit when he unsuccessfully sought review of the state agency's decision in the New York courts. As the Court applies preclusion principles to Title VII, the state court affirmance of the state agency decision—*not* the state agency decision itself—blocks any subsequent Title VII suit.

The Court reaches this result through a schizophrenic reading of § 706(b). See *ante*, at 469–470, and n. 8. According to the Court, when Congress amended § 706(b) so that state "proceedings" would be accorded "substantial weight," it meant two different things at the same time: it intended state agency "proceedings" to be accorded only "substantial weight," while, simultaneously, state judicial "proceedings" in review of those agency "proceedings" would be accorded "substantial weight and more"—that is, "preclusive effect." But the statutory language gives no hint of this hidden double meaning. Instead of reading an unexpressed intent into § 706(b), the Court should accept the plain language of the statute. All state "proceedings," whether agency proceedings or state judicial review proceedings, are entitled to "substantial weight," not "preclusive effect." As the Court implicitly concedes when it permits suit despite the conclusion

of agency proceedings, "substantial weight" is a very different concept from "preclusive effect," and Congress thus did not intend for the termination of any state "proceeding" to foreclose a subsequent Title VII suit.

In addition, the Court must disregard the clear import of § 706(c). That section explicitly contemplates that a complainant can bring a Title VII suit despite the termination of state "proceedings." Once again, the statute contains no suggestion that any state "proceeding" has preclusive effect on a subsequent Title VII suit. Nonetheless, contrary to § 706(c), the Court bars petitioner's Title VII suit because of the termination of state "proceedings."[6]

The Court's attempt to give § 706(b) a double meaning and to avoid the language of § 706(c) is made all the more awkward because the Court's decision artificially separates the proceedings before the reviewing state court from the state administrative process. Indeed, if Congress meant to permit a Title VII suit despite the termination of state agency proceedings, it is only natural to conclude that Congress also intended to permit a Title VII suit after the agency decision has been simply affirmed by a state court.

State court review is merely the last step in the administrative process, the final means of review of the state *agency's* decision. For instance, in New York, the NYHRD "is primarily responsible for administering the law and to that end has been granted broad powers to eliminate discriminatory practices." *Imperial Diner, Inc.* v. *State Human Rights Appeal Bd.*, 52 N. Y. 2d 72, 77, 417 N. E. 2d 525, 528 (1980). When, as in this case, the NYHRD finds no probable cause, a reviewing court must affirm the Division's decision unless it is "arbitrary, capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion," see

---

[6] The Court observes that this section does not address the issue of the proper weight to be afforded state decisions. See *ante*, at 471, n. 8. It is

N. Y. Exec. Law § 297–a(7)(e) (McKinney 1972),[7] that is, unless the decision is "devoid of a rational basis." *State Office of Drug Abuse Servs.* v. *State Human Rights Appeal Bd.*, 48 N. Y. 2d 276, 284, 397 N. E. 2d 1314, 1318 (1979). If the agency decides to hold a hearing, its decision must be affirmed if it is "supported by substantial evidence on the whole record." N. Y. Exec. Law § 297–a(7)(d) (McKinney 1972). See *State Division of Human Rights* v. *Syracuse University*, 46 App. Div. 2d 1002, 362 N. Y. S. 2d 104 (1974). See generally N. Y. Exec. Law § 298 (McKinney Supp. 1981–1982).

This review, therefore, is not *de novo* in the state courts. When it affirms the agency's decision, the reviewing court does not determine that the Division was correct. In fact, the court may not "substitute its judgment for that of the [NYHRD]," *State Division of Human Rights* v. *Mecca Kendall Corp.*, 53 App. Div. 2d 201, 203–204, 385 N. Y. S. 2d 665, 666–667 (1976); the court is "not empowered to find new facts or take a different view of the weight of the evidence if the [NYHRD's] determination is supported by substantial evidence," *State Division of Human Rights* v. *Columbia University*, 39 N. Y. 2d 612, 616, 350 N. E. 2d 396, 398 (1976), cert. denied *sub nom. Gilinsky* v. *Columbia University*, 429 U. S. 1096 (1977). In affirming, the reviewing court finds only that the agency's conclusion "was a reason-

true that § 706(c) does not specify the precise amount of deference due a state decision. But by permitting a complainant to file charges with the EEOC and ultimately to bring suit despite the termination of state proceedings, § 706(c) does provide that the termination of state proceedings will not have preclusive effect.

Section 706(f)(1) follows the same path. It permits the federal court to stay a Title VII suit pending termination of state "proceedings," without suggesting that the termination of state proceedings will preclude further action in the Title VII suit.

[7] Sections 297–a(7)(d) and (e) describe the scope of review by the New York Human Rights Appeal Board. Those standards also apply to review

able one and thus may not be set aside by the courts although a contrary decision may 'have been reasonable and also sustainable.'" *Imperial Diner, Inc.* v. *State Human Rights Appeal Bd.*, 52 N. Y. 2d, at 79, 417 N. E. 2d, at 529, quoting *Mize* v. *State Division of Human Rights*, 33 N. Y. 2d 53, 56, 304 N. E. 2d 231, 233 (1973).[8]

The Court purports to give preclusive effect to the New York court's decision. But the Appellate Division made no finding one way or the other concerning the *merits* of petitioner's discrimination claim. The NYHRD, not the New York court, dismissed petitioner's complaint for lack of probable cause. In affirming, the court merely found that the *agency's* decision was not arbitrary or capricious. Thus, although it claims to grant a state *court* decision preclusive ef-

---

by the New York courts of NYHRD decisions. See *Mize* v. *State Division of Human Rights*, 33 N. Y. 2d 53, 57, 304 N. E. 2d 231, 233 (1973); N. Y. Civ. Prac. Law § 7803 (McKinney 1981); Gabrielli & Nonna, Judicial Review of Administrative Action in New York: An Overview and Survey, 52 St. John's L. Rev. 361, 369–373 (1978).

[8] Despite these express statutory provisions and explanations from New York's highest courts, this Court seems to insist that New York courts pass upon the merits of a complainant's discrimination claim. See *ante*, at 480–481, n. 21. If this is the basis for the Court's decision giving the New York court's ruling preclusive effect, then today's decision is much less important than some might think at first glance. If a state court in fact adheres to a pure arbitrary and capricious standard, the Court might not grant such a state court decision preclusive effect.

On the other hand, the Court may be stating only that use of an arbitrary and capricious standard involves some examination of the merits, because the reviewing court must look at the evidence to determine if the agency acted in an arbitrary fashion. If this is the gist of the Court's argument, the Court advances its case very little. When a court reviews an agency record under a deferential standard of review, the agency, not the court, decides the merits of the claim.

The Court states that "[t]here is no requirement that judicial review must proceed *de novo* if it is to be preclusive." *Ante*, at 481, n. 21. Whether that conclusion is correct in the usual case or not, it certainly cannot stand in the context of Title VII. As the Court itself holds, Congress

fect, in fact the Court bars petitioner's suit based on the state *agency's* decision of no probable cause. The Court thereby disregards the express provisions of Title VII, for, as the Court acknowledges, Congress has decided that an adverse state agency decision will not prevent a complainant's subsequent Title VII suit.[9]

Finally, if the Court is in fact giving preclusive effect only to the state *court* decision, the Court misapplies 28 U. S. C. § 1738 by barring petitioner's suit. The state reviewing court never considered the merits of petitioner's discrimination claim, the subject matter of a Title VII suit in federal court. It is a basic principle of preclusion doctrine, see *ante*, at 481–482, n. 22, that a decision in one judicial proceeding cannot bar a subsequent suit raising issues that were not relevant to the first decision. "If the legal matters determined in the earlier case differ from those raised in the second case, collateral estoppel has no bearing on the situation." *Commissioner* v. *Sunnen*, 333 U. S. 591, 600 (1948). See also *Allen* v. *McCurry*, 449 U. S. 90, 94 (1980). Here, the state court decided only whether the state agency decision was arbitrary or capricious. Since the discrimination claim, not the validity of the state agency's decision, is the issue before the federal court, under § 1738 the state court's decision by itself cannot preclude a federal Title VII suit.

---

expressly intended that a state agency's determination would not bar a Title VII suit. When the state court does not conduct a *de novo* review, it accepts the determination of the state agency. When the Court gives such a state court affirmance preclusive effect, it thereby forecloses a Title VII suit based on a state agency's resolution of the complainant's discrimination charge—a result that Title VII condemns.

[9] The primacy of the state agency's decision is underscored by the source of the preclusion rule upon which the Court relies. To determine the preclusive effect the state court affirmance would have in the New York courts, the Court quotes N. Y. Exec. Law § 300 (McKinney 1972). *Ante,* at 467. But § 300 makes no reference to state court decisions; it prevents state suit after a final decision in any proceeding brought before the

Thus, the Court is doing one of two things: either it is granting preclusive effect to the state agency's decision, a course that it concedes would violate Title VII, or it is misapplying § 1738 by giving preclusive effect to a state court decision that did not address the issue before the federal court. Instead of making one of these two mistakes, the Court should accept the fact that the New York state court judicial review is simply the end of the state administrative process, the state "proceedings." The Court searches in vain for a partial repeal of § 1738 in Title VII because it is blind to the fact that judicial review is a part—indeed, a distinctly secondary part—of the administration of discrimination claims filed before the NYHRD.[10]

## II

### A

The Court's decision also flies in the face of Title VII's legislative history. Under the Court's ruling, a complainant is foreclosed from pursuing his federal Title VII remedy if he unsuccessfully seeks judicial correction of the state agency's adverse disposition of his discrimination charge. Thus, state proceedings are the complainant's sole remedy when he unsuccessfully pursues judicial review on the state side. But Title VII's legislative history makes clear that Congress never intended the outcome of state agency proceedings to be the discrimination complainant's exclusive remedy.

One of the principal issues during congressional consideration of Title VII in 1964 was the proper role of state fair employment practices commissions. See, e. g., 110 Cong. Rec. 7216 (1964). At various times, Congress considered proposals to give the state commissions exclusive jurisdiction over

---

NYHRD. Thus, for the purposes of state preclusion, a state court affirmance of the state agency's final decision is mere happenstance.

[10] One reason for the Court's decision is its fear that a state court affirmance of a state agency decision cannot be distinguished from a full state

discrimination charges. But, repeatedly, Congress rejected those proposals.

When Title VII was before the House for the first time, the House twice rejected attempts to prevent the application of Title VII in States that were enforcing adequate fair employment laws. See 110 Cong. Rec. 2727 (1964); *id.*, at 2828. In the end, the House provided for exclusive jurisdiction in the States, but only under certain conditions. Under the House version, the EEOC would have been given authority to determine the adequacy of state agency procedures. If it found the procedures to be adequate, the EEOC was directed to enter into a written agreement with the state agency. In States covered by those agreements, the EEOC would not bring civil actions in cases referred to in the agreements *and* the complainants would likewise be barred from bringing a civil suit in federal court. H. R. 7152, 88th Cong., 2d Sess., § 708(b) (1964). See 110 Cong. Rec. 7214 (1964).

But when the bill went to the Senate, the House approach was discarded for the present provisions of the statute.

---

court trial of a discrimination claim. See *ante*, at 469–470. This fear is unfounded.

When Congress permitted a complainant to bring a Title VII suit despite the termination of his state proceedings, it had proceedings connected with state antidiscrimination agencies clearly in mind. See §§ 706(c) and 709(b). Thus, the Court easily could hold that Congress referred to state administrative processing of discrimination claims, including judicial review of agency decisions, when it referred to "proceedings" in §§ 706(b) and (c), and, at the same time, could refuse to hold that Congress intended to include a state court trial on the merits of the complainant's claim within the term "proceedings."

Such a decision would be buttressed by the fact that the procedures available in state court closely approximate those available in federal court. Moreover, the policies favoring preclusion under 28 U. S. C. § 1738 would be considerably stronger if the merits of the discrimination claim had been settled by the state court itself. The Fourth Circuit recently had no difficulty distinguishing a state court trial on a discrimination claim from a

Senator Dirksen presented the explanation of the changes. *Id.*, at 12817. Among these was the statement that the exclusive-jurisdiction provision of the House bill "which provides for the ceding of Federal jurisdiction is deleted." *Id.*, at 12819. Instead, "it has been replaced by the new provisions of section 706 which provide that where there is a State or local law prohibiting the alleged unlawful employment practice, the State or local authorities are given exclusive jurisdiction *for a limited period of time*" (emphasis added). *Ibid.* Thus, after state proceedings had terminated, the complainant was free to seek federal remedies. See *id.*, at 12721 (remarks of Sen. Humphrey); *id.*, at 12595 (remarks of Sen. Clark) (accepting final version because complainant can "eventually" pursue federal remedies after applying for state relief).

Congress left open only a narrow exception for possible exclusive state agency jurisdiction. The EEOC was empowered to enter into worksharing agreements with state agencies. A worksharing agreement did not automatically foreclose a complainant from filing a federal civil suit, but the EEOC was free to include such a provision in a worksharing agreement if it considered that course wise. *Id.*, at 12820. See § 709(b).

Thus, in the end, Congress expressly decided that no discrimination complainant should be left solely to his remedies before state fair employment commissions, unless the EEOC agreed otherwise. Yet, contrary to this congressional choice, the Court would deny some discrimination victims any federal remedy and would make the decisions of state commissions their exclusive redress, even in the absence of an EEOC agreement. When a state court refuses to overturn a state commission's rejection of a complainant's dis-

---

state court affirmance of a state agency's determination. *Moosavi* v. *Fairfax County Bd. of Educ.*, 666 F. 2d 58 (1981).

crimination claim, the Court declares the state remedy to be exclusive.

## B

But the Court qualifies its holding. The Court permits the state agency's decision to be the complainant's exclusive remedy only if the agency's procedures satisfy the minimal requirements of due process. *Ante,* at 481–485. The Court surveys the procedures of the NYHRD and concludes that they are in accord with due process. *Ante,* at 483–485.[11] This discussion by itself demonstrates the fallacy of the Court's attempt to differentiate between the state agency's decision and the state court's affirmance of that decision. By relying more heavily on the adequacy of the state *agency's* procedures than on the adequacy of the state *court's* procedures, the Court underscores that it is, in fact, granting preclusive effect to a state administrative decision.

It is important, also, to note that in two different ways the Court's inquiry violates the congressional intent. First, the Court undertakes to determine whether the state procedures are adequate when Congress has expressly left that decision to the EEOC. Congress explicitly permitted a state complainant to file suit in federal court despite a final state agency decision, unless the EEOC has signed a worksharing agreement with the state agency foreclosing subsequent federal suits. If the EEOC agreed with the Court that minimal due process in agency procedures justified barring subsequent Title VII suits when the state agency's decision had been affirmed by a state court, the EEOC could sign worksharing agreements with state agencies on those terms. By assuming the authority to make that decision, the Court usurps a role that Congress reserved to the EEOC.

---

[11] The Court is quite correct in holding that a state decision must satisfy at least due process before it can be given preclusive effect in the federal courts. Indeed, this aspect of the Court's decision follows directly from

Second, throughout its consideration of Title VII, Congress was concerned that state agency procedures were not the equivalent of those that it intended federal authorities to employ. Senator Clark told the Senate that "State and local FEPC laws vary widely in effectiveness." 110 Cong. Rec. 7205 (1964). He continued: "In many areas effective enforcement is hampered by inadequate legislation, inadequate procedures, or an inadequate budget." *Ibid.* Unlike the Court, Congress realized that no legal doctrine could accurately gauge the effectiveness of state agencies and laws in eliminating discrimination. In their interpretative memorandum, Senators Clark and Case [12] explained:

> "It has been suggested . . . that there should be some provision automatically providing for exclusive State jurisdiction where adequate State remedies for discrimination in employment exist. Such a proposal is unworkable. Congress cannot determine nor can we devise a formula for determining which State laws and procedures are adequate. . . . An antidiscrimination law cannot be evaluated simply by an examination of its provisions, 'for the letter killeth, but the spirit giveth life.'" *Id.*, at 7214.

Yet the Court concludes that minimal due process standards provide safeguards sufficient to warrant denying a discrimination victim federal remedies if a state court rejects his request to overturn an adverse state agency decision. In Title VII, Congress wanted to assure discrimination victims more than bare due process; it wanted them to have the benefit of a vigorous effort to eliminate discrimination. See *Al-*

---

our decision earlier this term in *Logan* v. *Zimmerman Brush Co.*, 455 U. S. 422 (1982).

[12] The Clark-Case memorandum is a particularly authoritative source for determining the congressional intent behind Title VII. See *Teamsters* v. *United States*, 431 U. S. 324, 350–352, and 351, n. 35 (1977).

*exander* v. *Gardner-Denver Co.*, 415 U. S. 36, 44–45 (1974). By affording some discrimination complainants less, the Court contravenes the congressional intent behind Title VII.

## C

The Court's search of the legislative history uncovers only a single bit of concrete support for its interpretation of Title VII.[13] But, ironically, the legislative history cited by the Court actually undercuts its position. During the 1972 debates over changes in Title VII, Senator Hruska proposed an amendment that would have made Title VII the exclusive remedy for a discrimination victim, with certain exceptions. One of the exceptions permitted concurrent state proceedings. The Senator explained: "[T]here would be a further exception and that would be proceedings in a State agency. Those proceedings could continue notwithstanding the pendency of an employee's action under section 706 of title VII.

---

[13] The Court also cites legislative materials indicating that congressional defenders of employers and unions preferred trial *de novo* in federal court over conclusive administrative proceedings before the EEOC. See *ante*, at 473–475. But the Court focuses on the wrong choice. The question is not why Congress chose federal trial *de novo* over conclusive EEOC proceedings, but why Congress chose to provide a federal remedy rather than relying on state remedies. The reason is that Congress wanted to provide a federal remedy, whether before a federal court or the EEOC, separate from and independent of the antidiscrimination procedures afforded by the States.

Furthermore, the Court's decision is contrary to its own reading of the legislative history. Presumably, if the complainant prevails before the state agency and also before the state courts, the Court would give that decision in his favor preclusive effect. Thus, if state law provides the complainant with an inadequate remedy, evidently he will be able to bring a Title VII suit in federal court asserting the state decision as res judicata on the issue of the employer's liability. Yet the Court insists that Congress intended that employers not be bound by administrative findings but instead intended that employers have the protection of a trial *de novo* in federal court. *Ibid.*

It seems to me and others that this is only fair." 118 Cong. Rec. 3369 (1972). Thus, even Senator Hruska would not have prevented duplicative state and federal proceedings. Here is strong evidence of a congressional consensus that state and federal remedies should exist independently of each other.

The Court quotes part of Senator Javits' response to Senator Hruska's proposal. See *ante*, at 475. What the Court fails to point out is that the bulk of Senator Javits' response rejected the suggestion that the number of discrimination remedies should be reduced. Senator Javits quoted with approval from the testimony of an official of the Department of Justice:

> "In the field of civil rights, the Congress has regularly insured that there be a variety of enforcement devices to insure that all available resources are brought to bear on problems of discrimination. . . .
>
> "At this juncture, when we are all agreed that some improvement in the enforcement of Title VII is needed, it would be . . . unwise to diminish in any way the variety of enforcement means available to deal with discrimination in employment." 118 Cong. Rec. 3369–3370 (1972).

Thus, since Senator Javits was responding to a proposed amendment that expressly provided for separate federal and state proceedings, he certainly did not suggest that state proceedings should bar Title VII suits when he spoke of res judicata. See *ante*, at 475.[14] At the most, he may have been

---

[14] The Court finds it significant that Senator Javits referred to New York state administrative proceedings during his remarks. *Ante*, at 475–476, n. 17. But Senator Javits cited New York proceedings only to show that businessmen had not been subject to harassment through discrimination complaints; he did not mention state proceedings during his discussion of res judicata. See 118 Cong. Rec. 3370 (1972). Furthermore, when Senator Javits discussed res judicata, he spoke of litigation instigated by the EEOC, the Attorney General, and an individual. See *ante*, at 475. Thus, Senator Javits was addressing only federal proceedings; he was not sug-

referring to suits brought under overlapping federal statutes. And, given his reluctance to reduce the number of available antidiscrimination remedies, it is not clear that his remarks were intended to reach even that far.[15]  In no sense can the defeat of Senator Hruska's amendment be interpreted as a congressional endorsement of the Court's decision to bar a complainant's Title VII suit based on a state court affirmance of an adverse state agency decision.[16]  In Senator Javits' own words, "[w]e should not cut off the range of remedies which is available."  118 Cong. Rec. 3370 (1972).[17]

## III

The Court's opinion today is also contrary to the rationales underlying its past Title VII decisions.  Time and again, the Court has held that Congress did not intend to foreclose a

---

gesting that the outcome of state proceedings might have res judicata effect.  The EEOC and the Attorney General of the United States obviously do not participate in proceedings before the New York state agency.

[15] Since Senator Javits specifically mentioned successive suits brought by the EEOC, the Attorney General, and an individual, see *ibid.*, he may have been referring only to successive suits brought under Title VII.  See also 118 Cong. Rec. 3371–3372 (1972) (remarks of Sen. Williams) (rejecting Hruska amendment and insisting that 42 U. S. C. § 1981 and Title VII should not be mutually exclusive).

[16] The Court quotes Senator Williams' statement that "the individual claimant should [not] be allowed to litigate his claim to completion in one forum, and then if dissatisfied, go to another forum to try again."  118 Cong. Rec. 3372 (1972).  See *ante*, at 476.  But the Court fails to quote Senator Williams' immediately succeeding statement: "I do feel that where one form of relief proves unresponsive or impractical, . . . [the complainant] should have that right."  118 Cong. Rec. 3372 (1972).  Indeed, the feared unresponsiveness of some state agencies was a principal reason for the enactment of Title VII.  See 110 Cong. Rec. 7214 (1964); *Alexander* v. *Gardner-Denver Co.,* 415 U. S. 36, 48, n. 9 (1974).

[17] This reading of the statute is fully supported by the original legislative history of Title VII.  In 1964, Senator Tower offered an amendment similar to Senator Hruska's 1972 amendment, making Title VII the exclusive federal employment discrimination remedy.  110 Cong. Rec. 13650 (1964).  Like Senator Hruska's amendment, Senator Tower's made an exception for state proceedings.  *Ibid.*  There was no mention of res judicata during the

Title VII suit because of the conclusion of proceedings in another forum.

The case list begins with *McDonnell Douglas Corp. v. Green*, 411 U. S. 792 (1973), when the Court refused to prevent a plaintiff from bringing suit in federal court because of an EEOC determination of no reasonable cause. The Court cited "the large volume of complaints before the Commission and the nonadversary character of many of its proceedings," *id.*, at 799; noted that Title VII "does not restrict a complainant's right to sue to those charges as to which the Commission has made findings of reasonable cause," *id.*, at 798; and refused to "engraft on the statute a requirement which may inhibit the review of claims of employment discrimination in the federal courts," *id.*, at 798–799. The Court today could just as easily have written about "the nonadversary character" of state agency proceedings and the fact that Title VII does not "restrict a complainant's right to sue" to those charges as to which a state court has not affirmed the state agency's findings.

In *Alexander v. Gardner-Denver Co.*, 415 U. S. 36 (1974), the Court repeated the same theme by permitting a Title VII suit despite a prior adverse arbitration under a collective-bargaining agreement. The Court emphasized that Congress intended a scheme of overlapping, independent, supplementary discrimination remedies:

> "[L]egislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. . . . Title VII provides for consideration of employment-discrimination claims in several forums. . . . *And, in general, submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative his-*

debates, see *id.*, at 13650–13652, and the Senate rejected the amendment by a vote of 29 to 59. *Id.*, at 13652.

*tory of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes."* *Id.,* at 47–48 (footnotes omitted) (emphasis added).

The Court today disregards the congressional intent described in *Alexander* when it makes state agency proceedings the exclusive remedy for those complainants who unsuccessfully pursue state judicial review.

Finally, in two subsequent decisions, the Court adhered to *Alexander*. In *Johnson* v. *Railway Express Agency, Inc.,* 421 U. S. 454, 461 (1975), it held that Title VII and 42 U. S. C. § 1981, although "related" and "directed to most of the same ends," provide "separate, distinct, and independent" discrimination remedies. And in *Chandler* v. *Roudebush,* 425 U. S. 840 (1976), the Court permitted a federal employee to bring a Title VII suit even though the Civil Service Commission had affirmed a federal agency's rejection of the employee's discrimination claim.

In each of these four cases, the Court refused to close the doors of the federal courthouse to the Title VII plaintiff. The Court has allowed Title VII plaintiffs to sue in federal court, though they had failed before the EEOC, an arbitrator, and a federal agency. And even today's majority must add another forum to this list, namely, a state antidiscrimination agency. Until now, it has been "clear from [the] scheme of interrelated and complementary state and federal enforcement that Congress viewed proceedings before the EEOC and in federal court as supplements to available state remedies for employment discrimination." *New York Gaslight Club, Inc.* v. *Carey,* 447 U. S., at 65. The Court departs from the reasoning of an unbroken line of its prior decisions when it bars a discrimination complainant from suing under Title VII simply because he unsuccessfully sought state judicial "review" of an adverse state agency decision.

## IV

Perhaps the most disturbing aspect of the Court's decision is its tendency to cut back upon two critical policies underlying Title VII.

First, Congress intended that state antidiscrimination procedures be an integral part of the Nation's battle against discrimination. For that reason, Congress did not pre-empt state antidiscrimination agencies, see 110 Cong. Rec. 7216 (1964), and instead gave state and local authorities an initial opportunity to resolve discrimination complaints. See, *e. g.*, *id.*, at 12725 (remarks of Sen. Humphrey).

The Court's decision is directly contrary to this congressional intent. The lesson of the Court's ruling is: *An unsuccessful state discrimination complainant should not seek state judicial review.*[18] If a discrimination complainant pursues state judicial review and loses—a likely result given the deferential standard of review in state court—he forfeits his right to seek redress in a federal court. If, however, he simply bypasses the state courts, he can proceed to the EEOC and ultimately to federal court. Instead of a deferential review of an agency record, he will receive in federal court a *de novo* hearing accompanied by procedural aids such as broad discovery rules and the ability to subpoena witnesses. Thus, paradoxically, the Court effectively has eliminated state reviewing courts from the fight against discrimination in an entire class of cases. Consequently, the state courts will not have a chance to correct state agency errors when the agencies rule against discrimination victims, and the quality of

---

[18] Indeed, a prudent discrimination complainant may make every effort to *prevent* the state agency from reaching a final decision. If the complainant prevails after a full hearing, he runs the risk that his adversary may seek judicial review. He could then find himself closed out of federal court if a state court decides that the agency's decision is unsupported by sufficient evidence. See *Gunther* v. *Iowa State Men's Reformatory*, 612 F. 2d, at 1084. In some future case, the Court may find such a result inimical to Title VII but, given today's decision, no complainant could safely predict

state agency decisionmaking can only deteriorate.[19]   It is a perverse sort of comity that eliminates the reviewing function of state courts in the name of giving their decisions due respect.

This argument against preclusion is not novel.   In prior decisions, the Court has refused to set up incentives for discrimination complainants to abandon alternative remedies. In *Alexander* v. *Gardner-Denver Co.*, 415 U. S., at 59, it concluded: "Fearing that the arbitral forum cannot adequately protect their rights under Title VII, some employees may elect to bypass arbitration and institute a lawsuit.   The possibility of voluntary compliance or settlement of Title VII

---

that the Court would not apply § 1738.   For a complainant with some evidence to support his claim, the wiser course might well be to thwart all state proceedings and wait for EEOC attempts at conciliation and the full procedural advantages of federal court adjudication.

[19] The Court's response to this is unconvincing.   The Court argues that, if it does not give the state court affirmance preclusive effect, it will "lesse[n] the incentive for full participation by the parties and for searching review by state officials."   *Ante*, at 478.   It is difficult to see how this result will come about, when a complainant can win a ruling in his favor if he succeeds on judicial review and when his adversary risks losing the state court judgment if he does not rebut the complainant's arguments.   Moreover, the parties will have another incentive to litigate vigorously during state judicial review, because no one disputes that state court affirmances "may be admitted as evidence and accorded such weight as the [federal] court deems appropriate."   *Alexander* v. *Gardner-Denver Co.*, 415 U. S., at 60, that is, "substantial weight," see § 706(b).

The Court also insists that a reversal in this case would "reduce the incentive for States to work towards effective and meaningful antidiscrimination systems."   *Ante*, at 478.   This fact will undoubtedly surprise state officials in the 47 States outside the Second Circuit—States which have not been governed by the preclusion rule currently followed only in that Circuit.   See n. 2, *supra*.   These state officials unquestionably recognize, as did Congress when it passed Title VII, that state procedures can provide efficient dispute resolution, even if the possibility of a subsequent Title VII suit exists.   In any event, the Court hardly increases the quality of state decisionmaking when it effectively writes the state courts out of a large number of administrative cases.

claims would thus be reduced, and the result could well be more litigation, not less." In *New York Gaslight Club, Inc. v. Carey*, 447 U. S., at 65, the Court addressed state proceedings directly, explaining: "Complainants unable to recover fees in state proceedings may be expected to wait out the 60-day deferral period, while focusing efforts on obtaining federal relief. . . . Only authorization of fee awards ensures incorporation of state procedures as a meaningful part of the Title VII enforcement scheme." In this case, the Court has chosen preclusion over common sense, with the result that the state courts will decline, not grow, in importance.[20]

Second, the Court, for a small class of discrimination complainants, has undermined the remedial purpose of Title VII. Invariably, there will be some complainants who will not be aware of today's decision. The Court has thus constructed a rule that will serve as a trap for the unwary *pro se* or poorly represented complainant. For these complainants, their sole remedy lies in the state administrative processes. Yet, inevitably those agencies do not give all discrimination complaints careful attention. Often hampered by "inadequate

---

[20] Thus, when the Court labels this line of reasoning "dubious," see *ante*, at 478, n. 19, it is doubting not only the logic of this dissent, but also the logic of two prior decisions of this Court. In addition, it seems unlikely that many discrimination complainants will find the "delay," see *ante*, at 479, n. 19, of a Title VII suit a measurable burden when they take into account the procedural advantages of federal court litigation as compared with state judicial review of agency decisions.

The Court also questions whether the state decisionmaking process will improve through practice. See *ante*, at 478–479, n. 19. Although some might argue the point, it seems that state agencies will be more careful if their decisions are subject to state court review and that state decisionmakers will learn from experience. But even if the quality of state decisionmaking does not decline as fewer complainants seek state judicial review, a reduction in the number of discrimination cases handled by state courts obviously carries with it a reduction in the role of state authorities in resolving discrimination charges. This result is directly contrary to the congressional intent.

procedures" or "an inadequate budget," see 110 Cong. Rec. 7205 (1964), the state antidiscrimination agency may give a discrimination charge less than the close examination it would receive in federal court.[21]   When, as in this case, the state agency dismisses for lack of probable cause, the discrimination complainant is particularly at risk, because inadequate staffing of state agencies can lead to "a tendency to dismiss too many complaints for alleged lack of probable cause."[22]   Though state courts may be diligent in reviewing agency dismissals for no probable cause, the nature of the agency's deliberations combined with deferential judicial review can lead only to discrimination charges receiving less careful consideration than Congress intended when it passed Title VII.   The Court's decision thus cannot be squared with the congressional intent that the fight against discrimination be a policy "of the highest priority."   *Newman* v. *Piggie Park Enterprises*, 390 U. S. 400, 402 (1968).[23]

---

[21] See *Alexander* v. *Gardner-Denver Co.*, 415 U. S., at 57–58 (concluding that the informal procedures used during arbitration "mak[e] arbitration a less appropriate forum for final resolution of Title VII issues than the federal courts").

[22] Bonfield, An Institutional Analysis of the Agencies Administering Fair Employment Practices Laws (Part II), 42 N. Y. U. L. Rev. 1035, 1048–1049 (1967).   "[T]he vagueness of the probable cause concept makes it a flexible tool in the hands of a commissioner"; "[b]y tightening it he can cut the Agency's caseload, perhaps to allow the Agency to devote its resources to cases that may be expected to produce a higher return in terms of job opportunities, or perhaps only to disguise his own personal timidity." Note, The California FEPC: Stepchild of the State Agencies, 18 Stan. L. Rev. 187, 191 (1965).

The risk is heightened by the fact that the complainant evidently must present more proof to establish probable cause than to survive a summary judgment motion in federal court.   Probable cause exists when there is "reasonable ground of suspicion supported by facts and circumstances strong enough in themselves to warrant a cautious man in the belief that the law is being violated."   See *Goldberg* v. *State Commission for Human Rights*, 54 Misc. 2d 676, 680, 283 N. Y. S. 2d 347, 352 (1966).

[23] There is one final irony in the Court's decision.   While the Court holds that a New York court's affirmance of an adverse state agency decision

## V

For all these reasons, the Court's decision is neither "strongly suggested" nor "compelled" by *Allen* v. *McCurry*, 449 U. S. 90 (1980). See *ante*, at 476. In *McCurry*, the Court found only "the most equivocal support," 449 U. S., at 99, for an argument that Congress intended to override the general preclusion rule of § 1738 when it enacted 42 U. S. C. § 1983. But here, the language, the legislative history, and the fundamental policies of Title VII all demonstrate that Congress contemplated relitigation of a discrimination claim in federal court, even though a state court had refused to disturb a state agency decision adverse to the complainant.

And no drastic consequences would flow from a decision finding § 1738 inapplicable in this case. The Court would not be forced to permit a subsequent Title VII suit in federal court if the complainant already had lost a trial on the merits in state court. See n. 10, *supra*. Furthermore, the state court affirmance of the state agency's decision would not be discarded. The state decision could be "admitted as evidence and accorded such weight as the court deems appropriate," *Alexander* v. *Gardner-Denver Co.*, 415 U. S., at 60, that is, "substantial weight," see § 706(b).

But despite the reasonableness of the rule followed by other Courts of Appeals, see n. 2, *supra*, the Court improperly applies § 1738 to bar petitioner from bringing a Title VII suit in federal court. I dissent.

JUSTICE STEVENS, dissenting.

The issue that divides the Court is fairly narrow. The majority concedes that state agency proceedings will not bar a

---

precludes a complainant from bringing a federal Title VII suit, a New York court has held that an unsuccessful Title VII suit in federal court does *not* preclude a proceeding before the NYHRD. *State Division of Human Rights* v. *County of Monroe*, 88 Misc. 2d 16, 386 N. Y. S. 2d 317 (1976). Citing *Alexander* v. *Gardner-Denver Co.*, *supra*, the court noted that "dual or overlapping remedies were contemplated and expressly intended

federal claim under Title VII, *ante*, at 470, n. 7, and JUSTICE BLACKMUN assumes, *arguendo*, that a state court decision on the merits of a discrimination claim would create such a bar, *ante*, at 494–495, n. 10, and 508 (dissenting opinion). Thus, the area of dispute is limited to cases in which an adverse agency decision has been reviewed and upheld by a state court.

The proper resolution of the dispute depends, I believe, on the character of the judicial review to which the agency decision is subjected. If it is the equivalent of a *de novo* trial on the merits, then I would agree that the analysis in the Court's opinion leads to the conclusion that 28 U. S. C. § 1738 forecloses a second lawsuit in a federal court. But as JUSTICE BLACKMUN has demonstrated, *ante*, at 490–493, that is not the character of the relevant judicial review in New York. The New York court's holding that the agency decision was not arbitrary or capricious merely establishes as a matter of law that a rational adjudicator might have resolved the discrimination issue either way.\* It is therefore entirely

---

by Congress in Title VII," 88 Misc. 2d, at 19, 386 N. Y. S. 2d, at 320, and held that "neither res judicata nor collateral estoppel applies," *id.*, at 20, 386 N. Y. S. 2d, at 321.

\*In the two cases cited in *Flah's, Inc.* v. *Schneider*, 71 App. Div. 2d 993, 420 N. Y. S. 2d 283 (1979), the Appellate Division had developed the standard for reviewing agency dismissals for lack of probable cause. According to *Mayo* v. *Hopeman Lumber & Mfg. Co.*, 33 App. Div. 2d 310, 307 N. Y. S. 2d 691, motion for leave to appeal dism'd, 26 N. Y. 2d 962, 259 N. E. 2d 477 (1970), the test is whether the agency determination "was arbitrary, capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion." 33 App. Div. 2d, at 313, 307 N. Y. S. 2d, at 694 (paraphrasing N. Y. Exec. Law § 297–a(7)(e) (McKinney 1972)). The Appellate Division observed that "[f]or the [Divison of Human Rights] to dismiss his complaint under such circumstances it must appear virtually that as a matter of law the complaint lacks merit." 33 App. Div., at 313, 307 N. Y. S. 2d, at 695.

In *State Div. of Human Rights* v. *New York State Drug Abuse Control Comm'n*, 59 App. Div. 2d 332, 399 N. Y. S. 2d 541 (1977), the Division of Human Rights had dismissed the complaint after an investigation but with-

consistent with § 1738 for a federal district court to accept the New York judgment as having settled that proposition, and then to proceed to resolve the discrimination issue in a *de novo* trial.

---

out a hearing. The Appeal Board had reversed and remanded for further proceedings. In sustaining the Human Rights Division, the Appellate Division clarified its holding in *Mayo:*

"In *[Mayo]* it was not our intention to deprive the commissioner [of the Division of Human Rights] of his statutory duty to [determine whether there is a reasonable basis for sustaining the complaint, based upon complainant's evidence, and for requiring the employer to answer and submit to a hearing]. Thus, after the commissioner has made a full investigation, wherein the complainant has had full opportunity to present his evidence and exhibits, under oath if he so requests, if the commissioner determines that complainant has not shown probable cause for his complaint, the appeal board has no authority to reverse such determination and order a [hearing], provided that the commissioner's determination is rationally supported by the record before him." *Id.*, at 336–337, 399 N. Y. S. 2d, at 544 (citations omitted).

These cases demonstrate that the issue before a New York court reviewing an agency dismissal of a discrimination complaint is not the equivalent of the merits issue in a Title VII action.

The Court's citations to New York cases, *ante*, at 480–481, n. 21, simply do not support the general proposition that a New York court's affirmance of an agency's dismissal of a complaint necessarily determines that the complaint lacked merit as a matter of law. It is true that some of those cases contain language similar to the observation in *Mayo* that the agency may summarily dismiss a complaint only if it appears "virtually that as a matter of law the complaint lacks merit." As in *Mayo*, however, other language in those cases refutes the notion that only complaints meritless as a matter of law are permitted to be dismissed without hearings by the agency. See, *e. g., New York State Division for Youth* v. *State Human Rights Appeal Board*, 83 App. Div. 2d 972, 973, 442 N. Y. S. 2d 813, 814 (1981) ("We conclude that here, absent a full investigation including an opportunity for confrontation, the determination of the division was based on a record which was inadequate to meet the test of substantial evidence and was, therefore, arbitrary and capricious"); *State Division of Human Rights* v. *Blanchette*, 73 App. Div. 2d 820, 821, 423 N. Y. S. 2d 745 (1979) ("After the State Division of Human Rights has conducted an investigation of a complaint, with full opportunity to the complainant to support his or her claims of discrimination, the Division's determination of no probable

Both the text of Title VII and its legislative history indicate that Congress intended the claimant to have at least one opportunity to prove his case in a *de novo* trial in court. Thus, while I agree with the Court that Title VII did not impliedly repeal § 1738, I cannot accept the Court's construction of § 1738 in this case. In New York, as JUSTICE BLACKMUN demonstrates, the judicial review is simply a part of the "proceedings" that are entitled to "substantial weight" under Title VII.

Accordingly, I respectfully dissent.

---

cause and dismissal of the complaint may not be vacated by the Appeal Board or the court if it is supported by substantial evidence"). The facts of the cases also demonstrate that allegations that clearly state a cause of action are not necessarily sufficient to avoid dismissal without a hearing. See, *e. g.*, *Stasiak* v. *Montgomery Ward & Co.*, 66 App. Div. 2d 962, 411 N. Y. S. 2d 700 (1978). Moreover, it is perfectly clear that the New York courts do not reach an independent conclusion on the merits of a discrimination claim that has been adjudicated against the claimant by the agency after a formal hearing.